763 A.2d 324 (2000)
335 N.J. Super. 611
STATE of New Jersey, Plaintiff-Respondent,
v.
William STOTT, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued September 18, 2000.
Decided December 21, 2000.
*325 Salvatore Principato, Jr., Blackwood, argued the cause for appellant.
Wendy Alice Way, Deputy Attorney General, argued the cause for respondent (John J. Farmer, Jr., attorney for respondent; Ms. Way, of counsel and on the brief).
Before Judges HAVEY, WEFING and LEFELT.
The opinion of the court was delivered by WEFING, J.A.D.
After the trial court denied defendant's motions to suppress physical evidence seized and oral statements he provided to the police, defendant entered a plea of guilty to one count of possession of a controlled dangerous substance with intent to distribute, N.J.S.A. 2C:35-5a(1). The trial court sentenced defendant to a probationary term of five years, conditioned, inter alia, on defendant serving 364 days in the Camden County Correctional Facility. Defendant's sentence was stayed, pending this appeal in which defendant argues the trial court erred in denying his motions. After a careful review of the record presented in light of the contentions advanced on appeal, we affirm, although not for the reasons expressed by the trial court.
On September 23, 1997, defendant was admitted to Ancora State Psychiatric Hospital, a facility operated by the New Jersey Department of Human Services, following his involuntary commitment pursuant *326 to N.J.S.A. 30:4-27.10. An individual is not subject to involuntary commitment unless that individual is "mentally ill and ... dangerous to self or dangerous to others or property...." N.J.S.A. 30:4-27.9.
Upon his arrival at Ancora, defendant was a patient in Larch Hall, and was assigned to C ward, dormitory 216. Within that dormitory, he shared room A with another patient, James Hilliard. During the evening of October 7, 1997, defendant and Hilliard shared a quantity of heroin and consumed two Xanax tablets each and thereafter went to bed. When defendant awoke, he discovered that Hilliard died during the night, apparently from the drugs. When the hospital staff found Hilliard's body, they summoned both the Camden County Prosecutor's Office and the Human Services Police to investigate the circumstances of Hilliard's then-unexplained death. The room was secured and access restricted to investigators and hospital staff until Hilliard's body was removed shortly after 10:00 a.m.
Sergeant Jim Koslowsky of the Camden County Prosecutor's Office arrived at the hospital at approximately 8:45 a.m. All of the patients in the area, including defendant, had been removed from their rooms and were in the dayroom. Koslowsky began a series of interviews to determine what had happened.
At approximately 1:00 p.m., Koslowsky interviewed Anthony Fisher, a patient who occupied the room across the hall from Hilliard and defendant. Fisher told Koslowsky that defendant had, the previous evening, offered to sell him Xanax pills but that he, Fisher, had refused. Fisher also told Koslowsky that defendant had said that he kept the pills hidden in the hem of the curtain in the room he shared with Hilliard. Koslowsky immediately got up and, together with Officer Douglas of the Human Services Police, who was present at the interview, went into defendant's room and the two examined the curtain hem. There they discovered four Xanax pills, which they promptly seized.
At approximately 2:00 p.m., Koslowsky interviewed defendant who said that he had given money to Hilliard to obtain heroin for the two of them to share. Defendant said the pills in the curtain hem had belonged to Hilliard but he admitted offering to sell them to Fisher. During the course of the interview, defendant was told several times that he was free to leave; at no time was he advised of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). When defendant finished his statement, Koslowsky had to leave for another investigation that was in progress. He told Officers Douglass and Eickmeyer to tape defendant's statement. They did so, again telling defendant he could leave but not advising him of his Miranda rights. At the end of the tape-recorded statement, he was asked if he had given his statement voluntarily, and he responded that he did not feel he was "ready to speak to police at all today but sometimes you gotta do what you gotta do."
On October 22, 1997, defendant was transferred from Ancora to Maryville Hospital for alcohol and drug rehabilitation. On October 24, 1997, he was returned to Ancora for another, third interview. At this interview, he was again told he was free to leave and was not given any Miranda warnings. In this interview, he again said he and Hilliard had shared heroin and that they had taken Xanax as well. He denied trying to sell the Xanax to other patients.
Criminal charges were filed against defendant on October 30, 1997, and, in April 1998, defendant was indicted for possession of a controlled dangerous substance, N.J.S.A. 2C:35-10a(1), and possession of a controlled dangerous substance with intent to distribute, N.J.S.A. 2C:35-5b(13).
On appeal, defendant makes the following arguments:
*327 Point I Where police learn that involuntarily committed State Hospital mental patient has contraband hidden in his hospital room, may [they] dispense with the warrant requirement where the room [is] locked and secured and no exigency prevents getting a search warrant.
Sub-Point A
The [trial] court erred in finding a diminished expectation of privacy dispensing with warrant requirement in publicly funded mental hospital room where publicly funded legislature had provided pervasive legislative scheme and "Patient's Bill of Rights" disseminated to State mental patients pursuant to state law and regulations seek to bolster such patients' privacy expectations thus establishing a societal norm objectively supporting the reasonableness of Defendant's privacy expectations regarding his hospital room's contents from warrantless police searches and seizures and where no special police need establishes justifications to dispense with warrant requirement.
Sub-Point B
The trial court erred in finding that police needed no warrant to search patient rooms in that court's analogy to school administrators searching students lockers without warrants is inapt where police are searching residential mental patients' rooms as part of investigation independent of hospital administrators' goals.
Point II Trial court erred in finding that second police interrogation in police station cellar lacked the coercive police environment to constitute custodial interrogation requiring Miranda warnings: (A) Where Mental Patient was involuntarily committed to State Mental Hospital under highest level of security requiring confinement to locked Ward and not permitted off-Ward without staff escort; (B)Where patient had suffered severe anxiety attack on morning of police interrogation as well as night before; (C) Where patient had received numerous antidepressant and antianxiety drugs and illegal drugs including heroin and unprescribed Xanax; (D) Where patient experienced death of his roommate from heroin overdose during the night and thus has had little sleep; (E) Indicates to police he was not ready to talk to them; (F) Where police have searched patient's room and found illegal drugs that informant stated patient had offered him for sale and thus investigation had focused on patient; (G) No Miranda warnings were given; (H) Patient's court-appointed lawyer in connection with commitment was not consulted.

I
We turn first to the issues presented in connection with defendant's motion to suppress the Xanax pills retrieved from his hospital room. Defendant maintains that the warrantless search of his room violated his right against unlawful searches and seizures. We are unable to agree.
Before commencing a legal analysis of the question presented, it is important to note factually the nature of the area that was searched. The room in question was not assigned to defendant for his exclusive use during his hospital stay. Not only did he share it with Hilliard, but hospital staff and other patients could freely enter. Although the room could be locked by hospital staff from the hall, preventing any entry from the outside, it could not be locked from the inside. For obvious reasons, patients thus lacked the ability to prevent others from entering the room.
Each patient was provided with a bed, a night stand, and a wardrobe. The patients were provided with keys with which they could lock their respective wardrobes. Here, there was no attempt to secrete the Xanax in a locked container such as the wardrobe; rather, it was stored in a curtain *328 hem, an area of the room accessible to all who entered. Further, there was no attempt to open and examine the contents of Stott's wardrobe, even after discovery of the pills.
When a search is conducted without a warrant, as here, the State has the burden to demonstrate the lawfulness of the search. State v. Valencia, 93 N.J. 126, 459 A.2d 1149 (1983); State v. Santiago, 319 N.J.Super. 632, 726 A.2d 301 (App.Div. 1999). The State has to meet that burden by the preponderance of the evidence. State v. Bradley, 291 N.J.Super. 501, 677 A.2d 1129 (App.Div.1996).
The Fourth Amendment does not prohibit all warrantless searches and seizures but such warrantless searches and seizures are presumptively unreasonable. State v. Marshall, 123 N.J. 1, 586 A.2d 85 (1991), supp. 130 N.J. 109, 613 A.2d 1059 (1992), cert. denied, 507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 694 (1993). The New Jersey Supreme Court has held that warrantless searches are per se unreasonable unless they fall within one of the few recognized exceptions to the warrant requirement, such as searches incident to a lawful arrest, Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) or plain view observations, Texas v. Brown 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). Our Supreme Court included a detailed list of such exceptions in its opinion in State v. Hill, 115 N.J. 169, 173, 557 A.2d 322 (1989).

A
Before the trial court, the State maintained that the examination of the curtain hem and seizure of the pills did not require a warrant for two reasons: the existence of exigent circumstances and defendant had a diminished expectation of privacy in his hospital room. The trial court rejected the first argument but accepted the latter, citing State v. Alvarez, 238 N.J.Super. 560, 570 A.2d 459 (App.Div.1990).
Our analysis is, of course, governed by the principles enunciated by our own Supreme Court which has been steadfast in adhering to its obligations to protect the reasonable expectations of privacy of our citizens. State v. Hempele, 120 N.J. 182, 200, 576 A.2d 793 (1990). It has consistently recognized that our own New Jersey Constitution "`affords our citizens greater protection against unreasonable searches and seizures than does the fourth amendment.'" Id. at 195, 576 A.2d 793 (quoting State v. Novembrino, 105 N.J. 95, 145, 519 A.2d 820 (1987)).
Our research has not disclosed a reported New Jersey case that has considered the nature of the privacy interests involved in a search of a patient's hospital room. Other jurisdictions, however, have confronted the question. In Jones v. State, 648 So.2d 669 (Fla.1994), the Florida Supreme Court dealt with the police seizure from defendant's hospital room of a plastic bag containing his clothing as they left the room after interviewing him. Subsequent examination of the clothing provided evidence linking defendant with a homicide. The Court ultimately concluded that the seizure, while improper, was harmless error. Id. at 678. Within the course of its opinion, the court wrote
[W]e agree with the trial court that Jones did not have the heightened expectation of privacy in his hospital room that he would have had in his home. However, we cannot agree that a defendant's hospital room is a `public place' for Fourth Amendment purposes. While Jones could expect that hospital personnel would enter his room to perform routine hospital procedures ... Jones had no reason to believe that third parties would enter his room to look for and seize his personal property.

[Jones v. Florida, supra, 648 So.2d at 676-77].
In People v. Brown, 88 Cal.App. 3d 283, 151 Cal.Rptr. 749 (1979), a nurse admitted the police, who wished to interrogate defendant about a possible murder, to defendant's *329 hospital room. The closet in the room was open and the police could see a pair of blood-caked shoes. The police asked the nurse to secure the room and subsequently obtained a warrant to seize the shoes. Defendant challenged the warrant, arguing that the police observation of the shoes was tainted because they had no right to enter his room in the first instance. The court ultimately rejected defendant's argument. In doing so, it noted that "[a] hospital is, in a sense, sui generis.... [A]t least for certain purposes, a hospital room is fully under the control of the medical staff; yet for other purposes it is `the patient's room.'"
In Falter v. Veterans Admin., 632 F.Supp. 196 (D.N.J.1986), the District Court considered the objections of patients at Lyons Veterans Administration Medical Center to warrantless searches of their lockers. The court concluded that such "searches for contraband are proper and necessary if there is cause to believe contraband is present." 632 F.Supp. at 213.
A patient in a hospital may not bar the world from entering his room in the same manner an individual may retreat to the privacy of his home. Similarly, an individual at home may invite as many to cross his threshold as he may wish; but the ability of a patient in a hospital to receive guests may be limited, not only for his own well-being but the well-being of other patients. The staff of the hospital is charged with the responsibility to attend to the care and safety of all the patients, not just one individual.
Because we agree with the California court that a "hospital is, in a sense, sui generis", Brown, supra, and because our Supreme Court has clearly stated that "a lower expectation of privacy is not a sufficient basis on which to carve out an exception to the warrant and probable-cause requirement", Hempele, supra, 120 N.J. at 218, 576 A.2d 793, we decline to adopt the rationale of the trial court that defendant had a diminished expectation of privacy in the confines of his room as justification for the search and seizure.

B
We turn instead to the question whether exigent circumstances existed. Having had the opportunity to scrutinize the record in detail, we are satisfied that exigent circumstances did indeed exist which justified the actions of Sergeant Koslowsky and Officer Douglass.
Before analyzing the record and setting forth our reasoning, it is appropriate to note the standard governing our review of this question. To the extent the trial court's ruling rested upon factual findings, those determinations "should not ordinarily be disturbed where `there is substantial evidence to support [its] implicit finding[s].'" State v. Locurto, 157 N.J. 463, 471, 724 A.2d 234 (1999) (quoting Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 475, 541 A.2d 1063 (1988)). To the extent the trial court's ruling rested upon legal conclusions, our review is plenary. Manalapan Realty, L.P. v. Township Comm. of Twp. of Manalapan, 140 N.J. 366, 658 A.2d 1230 (1995).
Here, the trial court concluded that there were no exigent circumstances because, in its view, "the decedent's room had been secured to the point that no patients could enter it, and that the room continued to be secured and protected at the point when the police subsequently learned that there were pills in the hem of the curtain." Our review of the record, however, convinces us that the record does not support the finding that the room remained secure against unauthorized entry when Kozlowski and Douglass went to investigate.
As we noted earlier, Kozlowski arrived at the hospital at approximately 8:45 a.m., and he testified he entered defendant's room to examine the curtain at approximately 1:00 p.m. He testified that a number of people could have had access to the room during the time he was investigating *330 the circumstances of Hilliard's death. He noted that the room had been secured by the Human Services police when he arrived but that it "had [later] in a way been released. We had removed the body." Officer Frank Cichoski of the Human Services police testified that he had been assigned to secure the room but departed at approximately 10:30 a.m. after Hilliard's body and personal effects had been removed.
By its very nature, the parameters of the exigent circumstances exception to the warrant requirement cannot be definitively delineated. State v. Hutchins, 116 N.J. 457, 462, 561 A.2d 1142 (1989). The varied circumstances in which the police may confront an untoward exigency do not lend themselves to a comprehensive catalogue. Id. at 465, 561 A.2d 1142. Any search conducted in response to the presence of exigent circumstances must itself be reasonable. Id. at 470, 561 A.2d 1142. Further, a warrantless search conducted because of exigent circumstances "must be strictly circumscribed by the exigencies which justify its initiation." State v. Stupi, 231 N.J.Super. 284, 288, 555 A.2d 681 (App.Div.1989) (quoting Mincey v. Arizona, 437 U.S. 385, 393, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978)).
From our review of the record we are satisfied that there was a significant period of time during which people may have had access to the room. Even if one concluded that patients were barred from entering the room in light of the ongoing investigation, the police could not exclude the possibility of a rogue employee entering and retrieving the contraband.
We have no hesitancy in concluding that in the instant situation, the officers were confronted with exigent circumstances and were fully justified in looking for and retrieving the offending pills. We thus affirm the trial court's denial of defendant's motion to suppress the Xanax pills.[1]
We would be amiss, however, if we did not note that our determination that the record does not support the finding made is not intended as a criticism of the trial court. This matter was presented to the court in a disjointed fashion over a significant period of time. We have been furnished with the transcripts of all of the witnesses and have been able to correlate their testimony in a chronological manner not easily attainable by the trial court.

II
We turn now to whether the statements defendant provided to the police in the several interviews that were conducted should have been suppressed for failure to advise him of his Miranda rights. As to this issue we concur in the analysis of the trial court. The statements were not the product of custodial interrogation and the Miranda analysis is inapplicable. We affirm the trial court's denial of defendant's motion to suppress his statements essentially for the reasons stated by the trial court in its written opinion of January 26, 1999.
Affirmed.
NOTES
[1] The parties have not addressed, and thus neither have we, whether a need to assure that other patients were not endangered by these pills could provide a justification for the search and seizure, on grounds analogous to the community care-taking exception. Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); State v. Hill, supra.